Matthias, J.
The complaints herein charge that defendants “did act in a way tending to cause the delinquency of * * * Kay Gans, age 11 * * * in that * * * [said defendants] did consent to said child securing a marriage license and misrepresenting her age.”
These complaints charge an offense under the provisions of Section 2151.41, Revised Code, which reads as follows:
“No person shall abuse a child or aid, abet, induce, cause, encourage, or contribute to the dependency, neglect, or delinquency of a child or a ward of the Juvenile Court, or act in a way tending to cause delinquency in such child. No person shall aid, abet, induce, cause, or encourage a child or a ward of the court, committed to the custody of any person, department, public or private institution, to leave the custody, of such person, department, public or private institution, without legal consent. Each day of such contribution to such dependency, neglect, or delinquency is a separate offense.” (Emphasis added.)
The first clause of the first sentence of that section was interpreted and applied by this court in the case of State v. Miclau, Jr., 167 Ohio St., 38, 146 N. E. (2d), 293. In that case this *176 court determined that before one may be found guilty of contributing to the delinquency of a child it must first be established by evidence beyond a reasonable doubt that there was some delinquency of such child which the defendant either aided, abetted, induced, caused or to which he contributed. The finding of the court in that case, however, was limited to the first clause in Section 2151.41 by the writer of the opinion when he said, “further, it should be noted that the affidavit does not charge that defendant did, to use some of the words of that statute, ‘act in a way tending to cause delinquency.’ ”
Thus, the Mielan, case is not applicable to the facts of the instant cases, since the complaints herein are based upon the second clause of the first sentence of Section 2151.41, referring to acts “tending to cause delinquency.”
It is apparent that the purpose of that clause is to prevent a delinquency before it occurs rather than to await such delinquency and then punish the adult offender. The purpose of the clause is to avoid the undesirable result which might arise if an adult is permitted to pursue a course of conduct which tends to cause a child to become a delinquent. It is the old theory of preventive medicine. A disease is much easier to prevent than to cure. Under this clause in Section 2151.41, it is not necessary that the acts complained of result in delinquency, but only that the acts are such as would tend to cause delinquency in the child. See Williams v. City of Malvern, 222 Ark., 432, 261 S. W. (2d), 6; People v. Ostrowski, 334 Ill. App., 494, 80 N. E. (2d), 89; and People v. Mitchell, 148 Cal. App. (2d), 733, 307 P. (2d), 411.
The acts upon which the complaints herein are based are the consents of defendants to Kay’s misrepresenting her age and securing a marriage license.
It is here noted that the fact that such consents were given in a state other than Ohio is immaterial to the charges at hand because of the facts that Kay was an Ohio resident, and that she intended to remain so after her marriage.
It is also noted that the validity of the marriage is not in question here. The sole question is whether the defendants acted “in a way tending to cause delinquency” in Kay.
A delinquent child is defined by Section 2151.02, Revised Code, as follows:
*177 “ * * * ‘delinquent child’ includes any child:
“ (A) Who violates any law of this state, the United States, or any ordinance or regulation of a subdivision of the state;
“(B) Who does not subject himself to the reasonable control of his parents, teachers, guardian, or custodian, by reason of being wayward or habitually disobedient;
“(C) Who is an habitual truant from home or school; “(D) Who so deports himself as to injure or endanger the morals or health of himself or others;
“(E) Who attempts to enter the marriage relation in any state without the consent of. his parents, custodian, legal guardian, or other legal authority.”
It is conceded that, in order for the defendants to be guilty of violations of that part of Section 2151.41 with which we are concerned, their acts must have been such as would tend to cause Kay to become a ‘ ‘ delinquent child ’ ’ as defined by Section 2151. 02, supra.
In its opinion in the instant cases, the Court of Appeals stated that “it will be observed that if the marriage of the minor in the instant case can be found to be an act of delinquency it must be found in subsection (E) of the above-quoted section [Section 2151.02, supra].” That conclusion implies a much too narrow construction of that section. Although we agree wholeheartedly with the Court of Appeals that Kay did not act in such a way that she could be found to be a “delinquent child” under the provisions of subdivision (E) of Section 2151.02, since she did have her parents’ consent to marry, it does not follow that the convictions of the defendants should be reversed. The complaints under which the defendants were tried and convicted by a jury are not limited to subdivision (E), supra, but include only a statement of the operative facts which the state claims tended to cause delinquency in Kay. Therefore, unless it is found that the acts of defendants did not tend to cause Kay to be a delinquent child as defined by any of the subdivisions of Section 2151.02, the convictions may not be disturbed. We will, now proceed to examine the facts herein, in the light of the above.
It is beyond dispute that so-called “child marriages” are against the public policy of Ohio. Section 3101.01, Revised Code, establishes such public policy with respect..tq marriage and reads, in part, as follows;
*178 “Male persons of the age of 18 years, and female persons of the age of 16 years, not nearer of kin than second cousins, and not having a husband or wife living, may be joined in marriage. A minor must first obtain * * * consent * *
The first sentence of that statute sets forth who “may be joined in marriage.” It follows that all persons not included in the terms of reference of such sentence may not “be joined in marriage.” The statute specifically limits those who “may be joined in marriage” to “male persons of the age of 18 years, and female persons of the age of 16 years,” without other disability. It follows that male persons under the age of 18 years and female persons under the age of 16 years (and first cousins and persons having living spouses) may not be joined in marriage.
The second sentence of Section 3101.01 provides that “a minor must first obtain * * * consent” to marry. In the light of the first sentence of the statute, however, it is apparent that the word, “minor,” describes only those minors who may be joined in marriage upon obtaining consent, and such minors are male persons between the ages of 18 and 21 and female persons between the ages of 16 and 21. That statute does not contemplate the joining in marriage either of any male person under 18 years of age or of any female person under 16 years of age.
In the courts below, the question was raised and dealt with extensively as to who might, should or could have given consent to Kay’s marriage, the defendants arguing that under all the facts and circumstances of the instant cases they had such a right, being her adoptive parents and one of them being her legal custodian. The state argues that only the Juvenile Court could have consented to this marriage. How can anyone consent to an act which is against public policy? Under the facts herein no one, not even the Juvenile Court, could have consented to Kay’s marriage.
The only exception to the public policy against the marriage of male and female persons under the ages of 18 and 16, respectively, as sot out hereinbefore, is set forth in Section 3101.04, Revised Code, wherein it is provided that if a minor female person either is proved to be pregnant or has delivered an illegitimate child the Juvenile Court may inquire into the *179 matter, and “if as a result of the inquiry, one or both of the parents are made wards of the court, said court may, with the consent of said wards, their parents, if any are living, or of any guardian or custodian, give consent in the Probate Court.” The statute provides further that “the Probate Court may thereupon issue a license, notwithstanding either or both the contracting parties for the marital relation are under the minimum age prescribed in Section 3101.01 of the Revised Code.”
Section 3101.04 is merely a declaration by the General Assembly that the general public policy against “child marriages” must yield to a more important public policy based on the premise that a greater social benefit is derived from having as many members of our society as possible born and raised as “legitimate” rather than “illegitimate” children.
Since there is no indication in the records of the instant cases that Kay was either pregnant or had delivered an illegitimate child at the time of her marriage, it is seen that Section 3101.04 is immaterial to the question at hand, except that its very existence strengthens our conclusion that it was the intent of the General Assembly that, except in specifically described circumstances, no male person under the age of 18 and no female person under the age of 16 shall “be joined’in marriage” with or without consent. The reason for such public policy is clear.
In keeping with the increasing complexity of our modern civilization and the absolute necessity of a certain amount of maturity and knowledge on the part of each member thereof, the General Assembly has declared that male persons under 18 and female persons under 16 do not have the maturity and knowledge requisite to the entering of the marriage relationship with a full awareness of the ensuing obligations and responsibilities to their spouses, to the society in which they would establish themselves and to the children which they would rear. The General Assembly has declared further that, although male persons between the ages of 18 and 21 and female persons between the ages of 16 and 21 might have such a degree of maturity and knowledge as to be capable of creating a stable marriage relationship in which to rear children, final judgment on such matters must be made by a mature person or an institution having such right.
*180 The court realizes that neither the physiology of man nor some of his more basic instincts have changed much since he first became identifiable as “homo sapiens.” It is unquestioned that the “mating instinct” per se is and has been throughout the centuries one of such basic instincts, and that throughout the centuries male and female persons have been physically capable of realizing and fulfilling such instinct at an age earlier than that prescribed by the Ohio General Assembly as the mini-. mum age at'which two persons may “be joined in marriage.”
It is a matter of historic fact, however, that until a comparatively recent date the primary role played in “marriages” all over the world by the female person was solely that of consort and childbearer. Here again it is evident that a woman may well be capable of these activities prior to reaching the age of 16. It is also a matter of fact that in many countries of the world today these traditions still persist. It is noted, however, that, as a general rule, whenever and wherever the scope of a “Avife’s” activity is limited by custom, tradition or law merely to consortium and childbearing, she is looked upon as nothing much more than a chattel — a piece of personal property to be treated and dealt with as such.
It is undisputable and apparent to even the casual observer that such is no.longer the case in our Avestcrn civilization. Here woman has won a place for herself in the eyes of both the community and the law wherein she is distinguishable from male members of the community only by virtue of physical characteristics. She may vote, hold office, own property, initiate divorce proceedings, inherit, enter into contracts and, in general, engage in all those activities which were formerly restricted to male participation.
IioAvever, with this neAv freedom have come neAv responsibilities — responsibilities formerly shouldered only by male members of the community. Although it Avould be possible to expound at length on this particular subject, suffice it to say that education is one of such responsibilities.
After providing, in Section 3321.01, Revised Code, that “a child [male or female] between 6 and 18 years of age is of ‘compulsory school age,’ ” the General Assembly, in Section 3321.03, went on to provide that 11 every child of compulsory school age *181 who is not employed under an age and schooling certificate and has not been determined to be incapable of profiting substantially by further instruction shall attend a school which conforms to the minimum standards prescribed by the state Board of Education, under the conditions prescribed by law.”
The General Assembly then stated, in Section 3321.04, that it is the duty of every parent to see that a child between 6 and 18 does in fact attend school unless excused therefrom for one or more of the reasons set out in the latter part of the statute. A close examination of those reasons fails to disclose that marital duties, such as house cleaning, cooking, washing, caring for infants, etc., are among them.
These sections of the Code exemplify another public policy of this state, which is that our free civilization in this country and in this state will maintain itself and advance only as its members become educated so as to bo able to add their knowledge to that of their forefathers and thus progress.
We do not mean to imply that a high school education provides a modern person with world-shaking tools of knowledge such as those of the scientists who work with atomic energy. It seems beyond argument to this court, however, that a child who is not at least exposed to his own potentialities by a high school education (that contemplated by the statutes here under consideration) can hardly be expected to realize his potential either to himself or to his community, regax’dless of his basic or natural intelligence.
The court notes that a high school education is an absolute prerequisite to obtaining most jobs nowadays, and that it is most likely that Kay will need or want a job at sometime in the future.
These are obviously the reasons for the public policy of this state regarding compulsory school attendance, as set out in Chapter 3321 of the Revised Code, and we are in wholehearted agreement therewith.
At this point it is most significant to note that Section 3321. 22, Revised Code, pi'ovides:
“If the parent, guardian, or other person in charge of a child, upon complaint for a failure to cause the child to attend school * * * proves inability to do so, then such parent, guar *182 dian, or other person in charge of a child shall be discharged, and thereupon the attendance officer shall make complaint before the judge of the Juvenile Court of the county that the child is a delinquent child * * * within the meaning of Section 2151.02 * * * of the Revised Code. * * *” (Emphasis added.)
Although the records in these cases are silent as to whether Kay’s marital duties have yet caused her truancy, this court would be remiss in its duty if it shut its eyes to the facts that the duties of homemaker are strenuous, and that there is a certain propensity among young married couples to propagate, neither of which activity is conducive to regular attendance at school.
An exhibit introduced by the defendants herein is Kay’s “report card” for the years 1954 and 1955 and covering her work in the fifth grade at Saint Joseph School. Of a total of 93 grades reported thereon, both intermediate and final, Kay received A3 “A’s,” 49 “B’s,” and only one “C,” while being absent with excuse for a total of 431/2 days! In another section of the card relating to “Relations to God” and “Relations to Neighbor and Self” which contains 10 subdivisions resulting in a total of 60 marks, Kay was uniformly marked ‘ ‘ Attitudes and Habits commendable.” Although there are provisions for indicating “Improvement Desirable,” Kay received no such marks. In still another section of the card there is a space for indicating “Possible Causes for Deficiencies in Achievement.” That section contains no marks whatsoever. There were apparently no “deficiencies” in Kay’s achievement.
This is surely a “report card” of which most parents would be extremely proud. However, instead of encouraging Kay to continue to realize her potential, which as to their children is the natural and legally imposed duty of all parents with respect to compulsory schooling, as set out in Chapter 3321, Kay’s parents, the defendants herein, chose instead to encourage and actively participate in making possible her marriage — an activity which, as already indicated, would have strong propensities to render Kay incapable of continuing her school attendance, with the probable result that she would, before reaching 18, be found a delinquent child because of truancy.
This court finds, therefore, that the tendency of the acts of *183 the defendants in consenting to Kay’s misrepresenting her age and obtaining a marriage license is to encourage actions on the part of Kay which would in all probability cause her to be found to be a delinquent child under subdivision (C) of Section 2151. 02, Revised Code, which describes as a delinquent child one “who is an habitual truant from home or school.”
Although this alone is sufficient to sustain the convictions below, there is yet another aspect of the acts of the defendants which would tend to cause delinquency in Kay.
Subdivision (D) of Section 2151.02, supra, provides that a delinquent child is one “who so deports himself as to injure or endanger the morals or health of himself or others.”
Even if we were to assume for the purpose of argument that it is not probable that Kay’s schooling will be frustrated by her marriage, and were to assume that she will continue to attend school, it is at once apparent that she will, by virtue of her marriage, have certain knowledge and attitudes which will be far more mature than those of her classmates and about which most of her classmates will, if at all, only have begun to think seriously. It is such knowledge and attitudes that, even in more mature years, tend to keep married groups and single groups separate.
It is unfortunate but true that, assuming that Kay should remain in school, the more successful her marriage would be the more it could tend to cause her to act so as to adversely affect the morals of her classmates.
In conclusion, it is quite apparent that Section 2151.01, Revised Code, embodies some of the reasons why the public policy of this state is against “child marriages,” since it is seen that the consequences of such marriages tend to cause a child to become a delinquent as defined therein. Children of tender years tend to be guided more by adult advice and example and by their own unformed emotions than by thought and reflection. The Juvenile Court is concerned more with correction and prevention, if at all possible, than with punishment per se. Thus, although the minor-participants in “child marriages” are “more to be pitied than scorned,” the same attitude does not hold true of adults who participate in effecting such marriages — and it is the opinion of this court that it will behoove all adults, including parents, to discourage such marriages.
*184 Without pursuing further possibilities of consequences necessarily resulting from her marriage which would tend to cause Kay to become a “delinquent child” as defined by Section 2151.02, it is apparent that the acts of the defendants tend to cause the consequences hereinbefore outlined, and that they were guilty of acting “in a way tending to cause delinquency” in Kay.
It follows that the Court of Appeals erred in reversing the judgments rendered in the Court of Common Pleas, and that the judgments of the Court of Appeals should be, and they hereby are, reversed.

Judgments reversed.

Weygandt, C. J., Zimmerman, Bell and Herbert, JJ., concur.
Stewart and Taft, JJ., dissent.